El Juez Asociado Señor Martínez Torres
emitió la opinión del Tribunal.
Debemos analizar si lo resuelto en Fund. Surfrider y otros v. A.R.Pe., 178 D.P.R. 563 (2010), debe extenderse a los procesos administrativos tramitados al amparo de la Ley Núm. 76-2000 (3 L.P.R.A. sec. 1931 et seq.). Sujeto a lo anterior, debemos auscultar si un grupo de personas tiene legitimación activa para presentar un recurso de revisión judicial ante el Tribunal de Apelaciones. Evaluadas cuida-dosamente las controversias, respondemos la primera inte-rrogante en la afirmativa y la segunda en la negativa. Por los fundamentos que exponemos a continuación, revocamos el dictamen del Tribunal de Apelaciones.
I
El 19 de julio de 2010, el Gobernador de Puerto Rico, Hon. Luis G. Fortuño Burset, aprobó el Boletín Adminis-trativo Núm. OE-2010-034. En él se estableció que Puerto Rico enfrenta una crisis energética debido a que nuestra infraestructura de generación de energía eléctrica depende en un 70% de combustibles derivados del petróleo. Se in-dicó, además, que la dependencia de combustibles deriva-dos del petróleo expone a Puerto Rico a los efectos de cam-bios inesperados y súbitos en el precio y la disponibilidad del combustible.
Asimismo, se expuso en el Boletín Administrativo Núm. OE-2010-034 que la dependencia del petróleo perjudica nuestro medioambiente. Ello ocurre porque se contamina el aire y se contribuye al efecto de invernadero con todas sus consecuencias, que incluyen problemas de salud para todos los puertorriqueños. Véase Apéndice del certiorari, CC-11-722, págs. 1-3.
En atención a todo lo anterior, el Gobernador de Puerto *904 Rico declaró un estado de emergencia en cuanto a la infra-estructura de generación de energía eléctrica de Puerto Rico y ordenó que se activaran las disposiciones de la Ley Núm. 76-2000, supra, que permiten utilizar un proceso ex-pedito en situaciones de emergencias. De esta forma, se ordenó la utilización de un proceso sumario para el desa-rrollo de proyectos que fomenten una nueva infraestruc-tura de generación energética en la que se usen fuentes alternas a los combustibles derivados del petróleo.
La Junta de Calidad Ambiental (JCA), amparada en el Boletín Administrativo Núm. OE-2010-034, emitió el 12 de agosto de 2010 una resolución sobre “Procedimiento expe-dito para regir el proceso de presentación, evaluación y trá-mite de documentos ambientales para proyectos energéti-cos” (R-10-26-1). Mediante ese documento, se aprobó el procedimiento expedito para regir la evaluación de las de-claraciones de impacto ambiental y evaluaciones ambien-tales que se presentaran ante la JCA para acciones relacio-nadas al desarrollo de infraestructura de generación energética que utilice fuentes alternas a los combustibles derivados del petróleo.
Así pues, el 10 de septiembre de 2010 la agencia propo-nente, Autoridad de Energía Eléctrica (AEE), presentó ante la JCA un borrador de la Declaración de Impacto Am-biental Preliminar (DIA-P) para la evaluación del proyecto conocido como Vía Verde. En específico, el proyecto consiste en construir una línea de transferencia de gas natural que, de completarse, discurriría desde la central Eco Eléctrica en Peñuelas, hasta las centrales generatrices de Cambala-che en Arecibo, Palo Seco en Toa Baja y San Juan Steam Plant en San Juan. De igual forma, la AEE solicitó a la JCA la celebración de vistas públicas sobre la DIA-P y que, además, concediera la extensión del término de cinco a treinta días para el recibo de comentarios. Mediante la re-solución R-10-30-1, la JCA declaró “con lugar” la solicitud de vistas públicas y la extensión del término para recibir comentarios.
*905 El 16 de octubre de 2010 se celebraron una serie de vistas públicas investigativas ante la JCA en los pueblos de Barceloneta, Bayamón y Adjuntas. Comparecieron alre-dedor de ciento veintidós personas naturales y jurídicas representativas de diversos sectores de la sociedad. El 21 de octubre de 2010, el Panel Examinador que dirigió los procedimientos de las vistas públicas presentó su informe ante la JCA.
El 23 de octubre de 2010, la JCA aprobó el informe y lo remitió a la AEE con instrucciones de que atendiera los comentarios y las recomendaciones de la JCA, de la comu-nidad y de entidades gubernamentales. Además, exigió a la AEE que indicara las modificaciones a la acción propuesta que se determinaren necesarias, si alguna y, finalmente, que presentara la DIA-P con las enmiendas necesarias.
Ante ese cuadro fáctico, el 15 de noviembre de 2010, la AEE presentó la DIA-P ante la JCA. El 24 de noviembre de 2010 la JCA, luego de evaluar ese documento en conjunto con las recomendaciones del Sub-Comité Interagencial de Cumplimiento Ambiental por Vía Acelerada (Sub-Comité), emitió la resolución R-10-44-1, en la que requirió a la AEE la preparación de una declaración de impacto ambiental final (DIA-F). La AEE presentó la DIA-F el 29 de noviem-bre de 2010. El Sub-Comité evaluó el documento y remitió sus recomendaciones ante la JCA.
Posteriormente, la JCA aprobó el informe del Sub-Comité y sus recomendaciones. Asimismo, determinó que la DIA-F que presentó la AEE cumplió con todos los requi-sitos de la Ley Núm. 416-2004, conocida como la Ley sobre Política Pública Ambiental, 12 L.P.R.A. see. 8001 et seq., porque se consideró y analizó adecuadamente el impacto ambiental que conllevaba la acción propuesta.
En desacuerdo con el dictamen que emitió la JCA, se presentaron ante el Tribunal de Apelaciones tres recursos de revisión judicial: (1) KLRA20101238, que presentaron *906 Justo Lozada y otros; (2) KLRA20101246, que presentaron Juan Cortés Lugo y otros, y (3) KLRA20101248, que pre-sentó la Unión de Trabajadores de la Industria Eléctrica y Riego (UTIER). Ante ese escenario, la AEE y la JCA solici-taron la desestimación de los tres recursos. Fundamenta-ron su petitorio en que ninguno de los recurrentes poseía legitimación activa para solicitar la revisión judicial, con-forme estableció este Tribunal en Fund. Surfrider y otros v. A.R.Pe., supra.
El foro apelativo intermedio consolidó los tres recursos por tratarse de la misma controversia. De igual forma, luego de escuchar la posición de todas las partes, emitió una sentencia en la que desestimó los tres recursos de ape-lación por falta de jurisdicción. Cimentó su proceder en que ninguno de los recurrentes poseía legitimación activa para entablar una solicitud de revisión judicial ante ese foro.
En desacuerdo, Juan Cortés Lugo y otros y la UTIER solicitaron reconsideración al Tribunal de Apelaciones. La AEE y la JCA se opusieron. Sostuvieron que la desestima-ción de los recursos era el curso de acción correcto, porque no se demostró que existiera una legitimación activa. El 17 de junio de 2011, el Tribunal de Apelaciones ordenó a la AEE y a la JCA que mostraran su posición sobre los méri-tos de los recursos de revisión presentados.
Inconforme, el 21 de junio de 2011, la AEE presentó una moción en la que insistió que se denegaran las de reconsi-deración presentadas por la UTIER y Juan Cortés Lugo y otros. Por su parte, la JCA presentó el 13 de julio de 2011 una “Moción en solicitud de remedio”. Reclamó al Tribunal de Apelaciones que procedía resolver primero la moción que presentó la AEE, antes de ordenar cualquier otra pro-videncia en el caso.
Luego de varios trámites, el 18 de agosto de 2011, el Tribunal de Apelaciones modificó su sentencia, para reco-nocerle legitimación activa a Juan Cortés Lugo y otros. En *907 cuanto a la legitimación activa de la UTIER y Justo Lo-zada y otros, el foro apelativo intermedio sostuvo su deci-sión original de desestimación por carecer de jurisdicción sobre ellos. De igual modo, el Tribunal de Apelaciones dejó sin efecto sus Resoluciones de 17 de junio de 2011 y 15 de agosto de 2011, y concedió a la AEE y a la JCA treinta días para que se expresaran sobre los méritos del recurso. La Juez Hon. Laura Ortiz Flores no reconsideraría su decisión y, en consecuencia, no le reconocería legitimación activa a Juan Cortés Lugo y otros.
Subsiguientemente, la AEE presentó una “Moción Infor-mativa Urgente en torno a orden de 18 de agosto de 2011, en la que se reconoce legitimación en el caso de los recu-rrentes Juan Cortés Lugo et al., KLRA2010-01246”. En ella, argumentó que, aunque las alegaciones de Juan Cor-tés Lugo y otros no configuraban la existencia de legitima-ción activa, procedía desestimar el pleito por otro funda-mento adicional. En particular, alegó que se configuraba la doctrina de cosa juzgada en su modalidad de impedimento colateral por sentencia. Asentó su contención en que el mismo Panel del Tribunal de Apelaciones (Hon. Morales Rodríguez, Hon. Ortiz Flores y Hon. Surén Fuentes) emitió una sentencia en otro caso (KLAN201001851) en la que determinó que Juan Cortés Lugo y otros no tenían legiti-mación activa para instar una acción interdictal y de sen-tencia declaratoria contra el Proyecto Vía Verde. Ante ese escenario, Juan Cortés Lugo y otros solicitaron una pró-rroga de veinte días para oponerse a la moción informativa urgente que presentó la AEE.
Sin embargo, en vista de que transcurría el término para acudir de la resolución de 18 de agosto de 2011, la JCA y la AEE presentaron por separado dos recursos de certiorari ante este Tribunal. En ellos, aducen en esencia que Juan Cortés Lugo y otros no cuentan con legitimación activa para solicitar la revisión judicial de la decisión de la JCA que aprobó la DIA-F para el proyecto Vía Verde.
*908 Junto con los recursos, la AEE y la JCA presentaron por separado dos solicitudes de auxilio de jurisdicción con el propósito de que se paralizaran los procedimientos en el foro apelativo intermedio. Mediante Resolución de 9 de septiembre de 2011, declaramos “con lugar” esas mociones. Además, consolidamos los recursos presentados por tra-tarse de la misma materia. Por último, le concedimos un término de quince días a Juan Cortés Lugo y otros para que replicaran a los recursos que presentaron la AEE y la JCA. Así lo hicieron.
Por otro lado, el 17 de noviembre de 2011, Juan Cortés Lugo y otros presentaron una moción para la desestima-ción del recurso CC-2011-722, que presentó la AEE. Fun-damentaron su petitorio en que la notificación de la pre-sentación del recurso se hizo vía correo electrónico, método no contemplado a su entender en la Regla 39 de nuestro Reglamento, 4 L.P.R.A. Ap. XXI-A. Cónsono con lo anterior, adujeron que no se perfeccionó la notificación del recurso, por lo que este Tribunal no contaba con jurisdicción para atenderlo.
El 23 de noviembre de 2011, la AEE se opuso a la soli-citud de desestimación. En esencia, adujo que se podía uti-lizar el correo electrónico como método adecuado de notificación. Cimentó su contención en que la actual Regla 67.2 de Procedimiento Civil, 32 L.P.R.A. Ap. V, contempla ese método y que no hay razón para que este no se acepte.
Posteriormente, Juan Cortés Lugo y otros, presentaron una moción de desestimación de los casos que nos ocupan. Sustentan su reclamo en que el pleito se tornó académico porque alegadamente el Gobernador de Puerto Rico, Hon. Luis G. Fortuño Burset, y el Presidente de la Junta de Directores de la Autoridad de Energía Eléctrica modifica-ron la política pública en torno al proyecto Vía Verde que subyace este caso. En la alternativa, Juan Cortés y otros aducen que procede dejar “en suspenso la resolución del *909 caso hasta que se produzcan las decisiones definitorias que los funcionarios del ejecutivo han anunciado”. Moción de desestimación, pág. 2.
Como el recurso está perfeccionado, procedemos a resolver.
II
A
En primera instancia, nos corresponde resolver el planteamiento jurisdiccional que esbozaron Juan Cortés Lugo y otros en torno a la notificación de la presentación del certiorari por correo electrónico. Es principio reiterado que “[1] a jurisdicción es el poder o autoridad de un tribunal para considerar y decidir casos y controversias”. S.L.G. Solá-Moreno v. Bengoa Becerra, 182 D.P.R. 675, 682 (2011), citando a Asoc. Punta Las Marías v. A.R.Pe., 170 D.P.R. 253, 263 esc. 3 (2007).
Ante una situación en la que un tribunal no tiene la autoridad para atender un recurso, solo tiene jurisdicción para así declararlo y proceder a desestimar el caso. Carattini v. Collazo Syst. Analysis, Inc., 158 D.P.R. 345, 355 (2003). Dicho de otro modo, la falta de jurisdicción
... trae consigo las consecuencias siguientes: (1) no es susceptible de ser subsanada; (2) las partes no pueden volunta-riamente conferírsela a un tribunal como tampoco puede éste abrogársela; (3) conlleva la nulidad de los dictámenes emiti-dos; (4) impone a los tribunales el ineludible deber de auscul-tar su propia jurisdicción; (5) impone a los tribunales apelati-vos el deber de examinar la jurisdicción del foro de donde procede el recurso, y (6) puede presentarse en cualquier etapa del procedimiento, a instancia de las partes o por el tribunal motu proprio. González v. Mayagüez Resort & Casino, 176 D.P.R. 848, 855 (2009). Véase Pagán v. Alcalde Mun. de Cataño, 143 D.P.R. 314, 326 (1997).
*910 La Regia 39 de nuestro Reglamento, supra, establece en lo pertinente:
La notificación se efectuará por correo certificado con acuse de recibo o mediante un servicio similar de entrega personal con acuse de recibo. La notificación a las partes se hará dentro del término jurisdiccional o de cumplimiento estricto, según fuere el caso, para presentar el recurso. Cuando se efectúe por correo, se remitirá la notificación a los(as) abogado(as) de las partes o a las partes, cuando no estuvieren representadas por abogado(a), a la dirección postal que surja del último escrito que conste en el expediente del caso. Cuando del expediente no surja una dirección, de estar la parte representada por aboga-do(a), la notificación se hará a la dirección que de éste(a) surja del registro que a esos efectos lleve el(la) Secretario(a) del Tribunal Supremo. La fecha del depósito en el correo se conside-rará como la fecha de la notificación a las partes. La entrega personal deberá hacerse en la oficina de los(as) abogados(as) que representen a las partes y las notificaciones deberán en-tregarse a éstos(as) o a cualquier persona a cargo de la oficina. De no estar la parte representada por abogado(a) la entrega se hará en el domicilio o dirección de la parte o partes según ésta surja de los autos, a cualquier persona mayor de edad respon-sable que se encuentre en la misma. En los casos de entrega personal se certificarán la forma y las circunstancias de tal diligenciamiento, lo que se hará dentro de las próximas se-tenta y dos (72) horas desde que se efectuó la entrega. El tér-mino aquí dispuesto será de cumplimiento estricto.
En circunstancias no previstas por esta Regla, el Tribunal, motu proprio o a solicitud de parte, dispondrá el método de notificación que mejor se ajuste a las circunstancias particu-lares del caso.
De igual manera, el Comentario que acompaña a la Re-gla 39, supra, indica en lo que nos ocupa:
... Acogemos un método de notificación a las partes, similar al establecido en la Regla 67 de Procedimiento Civil .... Lo mismo hemos hecho en el Reglamento del Tribunal de Circuito de Apelaciones; véanse las Reglas 13, 23, 33 y 58 de ese Re-glamento .... Esta forma de notificación se refiere a los recur-sos de apelación, certiorari, certificación y recursos gubernati-vos en los casos pertinentes presentados. También se refiere a los recursos de mandamus dirigidos contra un juez, en rela-ción con un caso que está pendiente ante su consideración.
*911 Cónsono con lo anterior, la Regla 67.2 de Procedimiento Civil, 32 L.P.R.A. Ap. V, contempla la posibilidad de que se notifique vía correo electrónico. En específico, la Regla es-tablece:
Siempre que una parte haya comparecido representada por abogado o abogada, la notificación será efectuada al abogado o abogada, a menos que el tribunal ordene que la notificación se efectúe a la parte misma. La notificación al abogado o abo-gada o a la parte se efectuará entregándole copia o remitién-dola por correo, fax o medio electrónico a la última dirección que se haya consignado en el expediente por la parte que se autorrepresenta o a la dirección del abogado o abogada que surge del registro del Tribunal Supremo para recibir notifica-ciones, en cumplimiento con la Regla 9 de este apéndice. Si la dirección se desconoce, se notificará de ello al tribunal con copia del escrito de que se trate.
Entregar una copia conforme a esta regla significa ponerla en manos del abogado o abogada o de la parte, o dejarla en su oficina en poder de su secretario (a) o de otra persona a cargo de ésta. De no haber alguien encargado de la oficina, puede dejarla en algún sitio conspicuo de la misma, o si la oficina está cerrada o la persona a ser notificada no tiene oficina, dejándola en su domicilio o residencia habitual en poder de alguna persona que no sea menor de 18 años que resida allí. La notificación por correo quedará perfeccionada al ser depo-sitada en el correo o al ser enviada vía fax o por correo electrónico. (Enfasis nuestro.)
Por su parte, la Regla 1 de Procedimiento Civil, 32 L.P.R.A. Ap. V, indica que ese cuerpo de reglas “regirán todos los procedimientos de naturaleza civil ante el Tribunal General de Justicia”. (Enfasis nuestro.) A su vez, la Regla 52.1 de Procedimiento Civil, 32 L.P.R.A. Ap. V, dis-pone en lo que nos ocupa:
Todo procedimiento de apelación, certiorari, certificación, y cualquier otro procedimiento para revisar sentencias y resolu-ciones se tramitará de acuerdo con la ley aplicable, estas reglas y las reglas que adopte el Tribunal Supremo de Puerto Rico. (Enfasis suplido.)
Como se aprecia, nuestro Reglamento no establece ex-presamente la notificación de la presentación de los recur- *912 sos por vía electrónica. En cambio, la Regla 67.2, supra, lo permite. Ante este escenario, nos parece que cobra vigencia el Art. 18 del Código Civil, 31 L.P.R.A. sec. 18, que indica que “[l]as leyes que se refieren a la misma materia o cuyo objeto sea el mismo, deben ser interpretadas refiriendo las unas a las otras, por cuanto lo que es claro en uno de sus preceptos pueda ser tomado para explicar lo que resulte dudoso en otro”.
Así, un análisis integrado de las Reglas de Procedi-miento Civil demuestra que se puede notificar la presenta-ción de un recurso ante este Foro por correo electrónico. En primer lugar, la Regla 1 de Procedimiento Civil, supra, de-limita el alcance de ese cuerpo de reglas al Tribunal General de Justicia, lo que implica que este Tribunal está incluido. Además, la Regla 52.1, supra, establece que los procesos de presentación de apelación, certiorari y otros se tramitan de acuerdo con: (a) la ley aplicable, (b) las reglas de procedimiento civil y (c) los reglamentos que establezca este Foro. Esto implica que las normas que contiene cada cuerpo de normas no son excluyentes, sino que se comple-mentan y que la Regla 67.2, supra, que permite la notifi-cación por correo electrónico, aplica a los procesos ante este Tribunal.
Por consiguiente, no es correcta la contención de Juan Cortés Lugo y otros. La notificación de los recursos presentados ante este Tribunal se puede hacer vía correo certificado o método similar, mediante entrega personal, según es definida en la Regla 39, supra, y por correo electrónico.
B
Mencionamos recientemente en Asoc. Fotoperiodistas v. Rivera Schatz, 180 D.P.R. 920, 933 (2011), que “un caso se convierte en académico cuando con el paso del *913 tiempo su condición, de controversia viva y presente se ha perdido”. Como es conocido, un pleito resulta académico si “se trata de obtener un fallo sobre una controversia disfra-zada, que en realidad no existe”. San Gerónimo Caribe Project v. A.R.Pe., 174 D.P.R. 640, 652 (2008). Véanse, ade-más: Moreno v. Pres. U.P.R. II, 178 D.P.R. 969, 973 (2010); Lozada Tirado et al. v. Testigos Jehová, 177 D.P.R. 893, 908 (2010).
Y es que no puede ser de otra forma. “Los tribunales sólo debemos intervenir en controversias reales y vivas, en las cuales existan partes con intereses encontrados cuyo propósito sea obtener un remedio que tenga un efecto sobre la relación jurídica.” Asoc. Fotoperiodistas v. Rivera Schatz, supra, pág. 931. Véase E.L.A. v. Aguayo, 80 D.P.R. 552, 584 (1958).
En el caso que nos ocupa, Juan Cortés Lugo y otros nos invitan a que desestimemos los recursos de epígrafe a base de unos hechos futuros e inciertos. Dicho de otro modo, los recurridos pretenden que desestimemos el recurso, porque se han publicado noticias en los rotativos de la isla que denotan que la Rama Ejecutiva ausculta alternativas al-ternas al gasoducto. Véase los anejos que acompañan la moción de desestimación.
Un análisis de los hechos de los recursos de epígrafe a la luz de la doctrina de academicidad, nos lleva a concluir que los casos no se han convertido en académicos. Es decir, no podemos declarar académico un caso por un hecho futuro e incierto del cual no podemos tomar conocimiento judicial. Véase U.P.R. v. Laborde Torres y otros I, 180 D.P.R. 253, 276 (2010).
En cuanto al remedio alternativo que solicitan Juan Cortés Lugo y otros a los efectos de que dejemos la resolu-ción de los casos en suspenso, basta con indicar que no hay razón para ello. Los recursos no son académicos y conse-cuentemente, existe una controversia viva y latente que requiere nuestra atención.
*914 Así las cosas, no tienen mérito las solicitudes de deses-timación que presentaron Juan Cortés Lugo y otros. Luego de dilucidar el aspecto jurisdiccional, pasamos a resolver los méritos de los recursos consolidados.
III
A
De acuerdo con la Ley Núm. 76-2000, supra, la Asam-blea Legislativa de Puerto Rico incorporó a nuestro orde-namiento jurídico una legislación que permite preterir el cauce administrativo ordinario en situaciones de emergencia. Al auscultar la exposición de motivos de esa ley, notamos que la intención del legislador fue dotar al poder ejecutivo de “mayor eficiencia y efectividad en la so-lución de problemas y necesidades relacionadas [a una] emergencia”. Exposición de Motivos de la Ley Núm. 76 (2000 (Parte 1) Leyes de Puerto Rico 651).
El Art. 1(a) de la Ley Núm. 76, 3 L.P.R.A. see. 1931, expresa qué constituye una emergencia:
(a) “Emergencia” — significa cualquier grave anormalidad como huracán, maremoto, terremoto, erupción volcánica, se-quía, incendio, explosión o cualquier otra clase de catástrofe o cualquier grave perturbación del orden público o un ataque por fuerzas enemigas a través de sabotaje o mediante el uso de bombas, artillería o explosivos de cualquier género o por me-dios atómicos, radiológicos, químicos o bacteriológicos o por cualesquiera otros medios que use el enemigo, en cualquier parte del territorio del Estado Libre Asociado de Puerto Rico, que amerite se movilicen y se utilicen recursos humanos y económicos extraordinarios para remediar, evitar, prevenir o disminuir la severidad o magnitud de los daños causados o que puedan causarse. De igual manera, el término “emergen-cia” comprende cualquier evento o graves problemas de dete-rioro en la infraestructura física de prestación de servicios esenciales al pueblo o, que ponga en riesgo la vida, la salud pública o seguridad de la población o de un ecosistema sensitivo.
*915 Ahora bien, para que se configure una emergencia es necesario que el Gobernador de Puerto Rico así lo disponga mediante orden ejecutiva al efecto. Además, la emergencia tiene que estar vislumbrada en la definición que el legisla-dor estableció en el Art. 1 de la Ley Núm. 76, supra.
Por otro lado, el Art. 2 de la Ley Núm. 76 (3 L.P.R.A. see. 1932) establece que durante el periodo de tiempo que dure la emergencia, se dispensará del cumplimiento con los términos y procedimientos ordinarios a las agencias gubernamentales con injerencia en la tramitación de permisos, endosos, consultas o certificaciones.
Así, los Arts. 3 y 8 de la Ley Núm. 76 (3 L.P.R.A. sees. 1933 y 1938) instrumentalizan parte del trámite expedito al acortar el término de recibo de comentarios a cinco días y limitar la notificación a las partes interesadas en un solo aviso en dos diarios de circulación general. Contrástese con las Sees. 2.1-2.2 de la L.P.A.U., 3 L.P.R.A. sees. 2121-2122.
Sin embargo, aunque los procedimientos al amparo de la Ley Núm. 76, supra, son más flexibles, no están exentos de revisión judicial. De esta forma, el Art. 13 de esa ley, 3 L.P.R.A. see. 1943, indica, en lo pertinente:
La parte adversamente afectada por cualquier resolución u orden emitida por alguna agencia tendrá como único remedio presentar una solicitud de revisión ante el [Tribunal de Apelaciones], Cualquier solicitud de revisión judicial de la agencia administrativa concernida deberá presentarse ante dicho Tribunal, dentro del término jurisdiccional de veinte (20) días naturales, contados a partir de la fecha en que se archive en autos copia de la notificación de la resolución u orden final de la agencia. La parte recurrente notificará la presentación de la solicitud de revisión a la agencia recurrida y a todas las partes interesadas dentro del término establecido; Disponién-dose, que el cumplimiento con dicha notificación será de carác-ter jurisdiccional. (Enfasis suplido.)
Este inciso deja meridianamente claro que los procedi-mientos tramitados al palio de la Ley Núm. 76, supra, son *916 revisables por el foro apelativo intermedio. No obstante, el término para recurrir a ese tribunal para cuestionar una decisión administrativa es de veinte días, a diferencia de los treinta días que concede la See. 4.2 de la Ley Núm. 170 de 12 de agosto de 1988, conocida como Ley de Procedi-miento Administrativo Uniforme (L.P.A.U.), 3 L.P.R.A. see. 2172. Es preciso hacer constar que, aparte de la diferencia en el término, el contenido de ambas disposiciones de ley son muy similares. Ambas hacen referencia a la parte ad-versamente afectada por la decisión administrativa. Por esa razón, nuestra normativa jurisprudencial en torno a la legitimación activa necesaria para acudir en revisión judicial de una decisión administrativa aplica a los procesos seguidos al amparo de la Ley Núm. 76, supra. Resolver de otra forma sería burlar el principio de justiciabilidad que ha permeado por décadas nuestro ordenamiento jurídico. Asoc. Fotoperiodistas v. Rivera Schatz supra; Moreno v. Pres. U.P.R. II, supra; Lozada Tirado et al. v. Testigos Jehová, supra; E.L.A. v. Aguayo, supra. Dicho de otro modo, sería abrir la puerta para que el Tribunal de Apelaciones emita opiniones consultivas sin que exista una controver-sia viva y latente.
Consecuentemente, procede auscultar si Juan Cortés Lugo y otros tenían legitimación activa para presentar el recurso de revisión judicial ante el Tribunal de Apelaciones.
B
Frecuentemente hemos expresado el principio axiomático de nuestro ordenamiento legal que predica que los tribunales solo podemos resolver aquellos casos que sean justiciables. Asoc. Fotoperiodistas v. Rivera Schatz, supra, pág. 931. “Una controversia abstracta, ausente un perjuicio o amenaza real y vigente a los derechos de la parte que los reclama, no presenta el caso y controversia *917 que la Constitución exige para que los tribunales puedan intervenir.” Moreno v. Pres. U.P.R. II, supra, pág. 973. Véanse, además, Lewis v. Continental Bank Corp., 494 U.S. 472 (1990); Lozada Tirado et al. v. Testigos Jehová, supra.
De esta forma, “los propios tribunales deben pregun-tarse y evaluar si es o no apropiado entender en un deter-minado caso, mediante un análisis que les permite ejercer su discreción en cuanto al límite de su poder constitucional”. Smyth, Puig v. Oriental Bank, 170 D.P.R. 73, 76 (2007). Véase, además, E.L.A. v. Aguayo, supra.
Ahora bien, este principio de justiciabilidad responde al rol asignado a la Rama Judicial en una distribución tripartita de poderes, esquematizada para asegurar que no actuará en áreas sometidas al criterio de las otras ramas del gobierno. Com. de la Mujer v. Srio. de Justicia, 109 D.P.R. 715, 720 (1980).
Por su pertinencia, citamos de nuestra opinión reciente en Fund. Surfrider y otros v. A.R.Pe., supra, pág. 572, en la que discutimos abundantemente el tema que nos ocupa:
Una de las doctrinas de autolimitación derivadas del prin-cipio de “caso o controversia” es la legitimación de la parte que acude ante el foro judicial. En el ámbito del derecho adminis-trativo, cuando un litigante solicita la revisión judicial sobre la constitucionalidad de una acción o decisión administrativa a través de un pleito civil, éste tiene que demostrar que: (1) ha sufrido un daño claro y palpable; (2) el daño es real, inmediato y preciso, no abstracto o hipotético; (3) existe una relación causal razonable entre la acción que se ejercita y el daño alegado, y (4) la causa de acción debe surgir al amparo de la Constitu-ción o de alguna ley. (Citas omitidas.)
Se deduce de lo anterior que toda persona que interese presentar un recurso de revisión judicial ante el Tribunal de Apelaciones, tiene que cumplir con el requisito de legi-timación antes esbozado. Fund. Surfrider y otros v. *918 A.R.Pe., supra, págs. 574-575. Véase, además, D. Fernández Quiñones, Derecho administrativo y Ley de Procedimiento Administrativo Uniforme, 2da ed., Bogotá, Ed. Fórum, 2001, pág. 500.
Hemos expresado que una asociación “tiene legitimación para solicitar la intervención judicial por los daños sufridos por la agrupación y para vindicar los derechos de la entidad”. Fund. Surfrider y otros v. A.R.Pe., supra, pág. 572. Por otro lado, cuando una asociación acude al foro judicial a vindicar los derechos de al menos uno de sus miembros es necesario probar que: “(1) el miembro tiene legitimación activa para demandar a nombre propio; (2) los intereses que se pretenden proteger están relacionados con los objetivos de la organización, y (3) la reclamación y el remedio solicitado no requieren la participación individual [de cada miembro]”. Id., pág. 573. Véase, además, Col. Ópticos de P.R. v. Vani Visual Center, 124 D.P.R. 559 (1989).
De esta forma, al interpretar la See. 4.2 de la L.P.A.U., supra, señalamos en Fund. Surfrider y otros v. A.R.Pe., supra, págs. 575-576, que para que un “litigante pueda presentar el recurso de revisión judicial tiene que satisfacer dos requisitos: (1) ser parte y (2) estar ‘adversamente afectado’ por la decisión administrativa. Además, deberá agotar los remedios administrativos y recurrir dentro del término provisto”. (Escolio omitido.)
En el caso que nos ocupa, ni la AEE ni la JCA cuestio-nan si Juan Cortés Lugo y otros son partes para fines del proceso administrativo. Por el contrario, su argumentación va dirigida a establecer que los recurridos no fueron adver-samente afectados por la aprobación de la DIA-F. Por tal razón, nos concentramos en ese aspecto.
En Fund. Surfrider y otros v. A.R.Pe., id., pág. 579, concluimos luego de un análisis minucioso que “la frase ‘adversamente afectada’ significa que la parte recurrente [en el Tribunal de Apelaciones] tiene un interés sus- *919 tancial en la controversia porque sufre o sufrirá una lesión o daño particular que es causado por la acción administra-tiva que se impugna mediante recurso de revisión judicial”.
Añadimos que el daño que tiene que sufrir la persona que interese acudir en revisión judicial tiene que “ser claro, específico y no puede ser abstracto, hipotético o especulativo”. Id. De esta forma, aunque “reconocimos que la lesión se puede basar en consideraciones ambientales, recreativas, espirituales o estéticas”, señalamos “esto no quiere decir que la puerta está abierta de par en par para la consideración de cualquier caso que desee incoar cualquier ciudadano en alegada protección de política pública’ ”. íd. pág. 573, citando a Salas Soler v. Srio. de Agricultura, 102 D.P.R. 716, 723-724 (1974).
En Misión Ind. P.R. v. J.C.A., 145 D.P.R. 908, 925 (1998) indicamos que
... el proceso de preparar y aprobar una declaración de im-pacto ambiental es, en esencia, sólo un instrumento para ase-gurar que la conservación y el uso racional de los recursos naturales han de tenerse propiamente en cuenta al momento de hacer planes y tomar las primeras decisiones gubernamen-tales sobre una propuesta que pueda tener un impacto en el medio ambiente. En situaciones como la de autos, dicha decla-ración es sólo un instrumento de planificación, la primera etapa de un largo camino de autorizaciones oficiales en el de-sarrollo de un proyecto.
Dicho de otro modo, la aprobación de la DIA-F por parte de la JCA no es un permiso ni una licencia, sino que es un instrumento de planificación. En él, la JCA tiene que ase-gurarse de que el proponente analizó el impacto ambiental del proyecto propuesto. Art. 3 de la Ley Núm. 416 (12 L.PR.A. see. 8001). Es decir, la JCA no aprueba ni des-aprueba el proyecto en cuestión; solo ausculta si el propo-nente tomó en consideración la conservación del ambiente.
Mencionamos también que “cualquier ciudadano o grupo de ciudadanos afectados por la falta de implantación *920 de la Ley 9 [actual Ley Núm. 416] puede presentar las acciones judiciales que procedan para asegurarse que se logren los fines de protección ambiental”. (Enfasis suplido.) Misión Ind. P.R. v. J.C.A., supra, pág. 927. Esto es cónsono con la doctrina de legitimación activa.
Ahora bien, resulta ineludible diferenciar la aprobación por parte de la JCA de una DIA-F, de la aprobación de construcción del proyecto en sí. Es decir, “superada la etapa de la aprobación de la declaración de impacto am-biental, la construcción y el inicio de operaciones del pro-yecto propuesto no pueden llevarse a cabo sin que se aprueben una serie de permisos que también están dirigi-dos a asegurar la protección ambiental”. (Enfasis en el original.) íd., págs. 925-926.
Así pues, la aprobación de la DIA-F es un paso inicial en el proceso de la tramitación de permisos que no puede confundirse con la autorización gubernamental que permite el comienzo de las obras de construcción.
La legitimación se evaluará con referencia a “la acción administrativa que se impugna mediante recurso de revisión judicial”. Fund. Surfrider y otros v. A.R.Pe., supra, pág. 579. Por ello, la parte que solicita la revisión judicial de la decisión final de la JCA en el proceso de aprobación de una declaración final de impacto ambiental (DIA-F) tiene que demostrar que esa actuación le causó o le causará “una lesión o daño particular”. íd.
Claro está, ese daño tiene ser causado por la decisión administrativa de la cual se recurre. Nótese que en este caso no se está cuestionando “la concesión de los permisos para la construcción y el inicio de operaciones del proyecto propuesto”. Misión Ind. P.R. v. J.C.A., supra, pág. 926. La acción administrativa que se cuestiona es la aprobación de una DIA-F, en la que la AEE tuvo la obligación de conside-rar y detallar por escrito las consecuencias ambientales significativas vinculadas a su propuesta. Este es un asunto diferente a los permisos para la construcción y operación *921 del proyecto Vía Verde. Evaluaremos la legitimación activa de los reclamantes con esa distinción en mente.
IV
El Tribunal de Apelaciones concluyó en reconsideración que Juan Cortés Lugo y otros tenían legitimación para pre-sentar el recurso de revisión judicial, porque demostraron “con datos suficientes, el grado de afección necesario para solicitar la revisión judicial”. Apéndice del certiorari, CC-11-718, pág. 2. No obstante, luego de analizar las alegacio-nes de los recurridos, es necesario concluir que estos no demostraron legitimación activa para presentar el recurso de revisión judicial que nos ocupa.
Los recurridos, Juan Cortés Lugo, Sofía Colón Matos, Luis Guzmán Meléndez, Ana Oquendo Andújar y Gustavo Casalduc Torres, adujeron que son dueños de fincas por donde podría pasar el proyecto Vía Verde. Además, señalan que discurren por sus terrenos cuerpos de agua que se po-drían ver perjudicados, aunque no especifican de qué manera. Sin embargo, concretamente no enumeraron qué daño les causó la aprobación de la DIA-F. Por el contrario, utilizaron contenciones especulativas para concluir que la aprobación de la DIA-F les afecta. Con rigor analítico es menester concluir que los recurridos Cortés Lugo, Colón Matos, Guzmán Meléndez, Oquendo Andújar y Casalduc Torres no demostraron poseer legitimación activa en este caso.
De igual forma, otro grupo de los recurridos(1) alegan en *922 síntesis que el proyecto Vía Verde pasaría muy cerca de sus residencias, ubicadas en diferentes municipios de la Isla. No obstante, estos recurridos no detallan de forma especí-fica y clara en qué consisten los daños en particular. Más allá de invocar un “temor por su seguridad”, no presentan hechos concretos que demuestren daños por la aprobación de la DIA-F, por lo que estos tampoco demostraron legiti-mación activa. Apéndice del recurso, pág. 34.
Por otro lado, el Comité Bo. Portugués en Contra del Gasoducto (Comité Bo. Portugués) y sus portavoces, Sr. Carlos Cabán Cañedo, Sr. Luis Rodríguez Cruz, Sr. Jorge Rivera Rodríguez, señalaron que el despliegue de funciona-rios en su comunidad y el sobrevuelo de helicópteros han causado temor, ansiedad y falta de descanso necesario en-tre los residentes. Apéndice del certiorari, CC-11-718, pág. 29. Además, indicaron que había varios cuerpos de agua importantes que discurrían por el barrio Portugués. No obstante, el Comité Bo. Portugués no pudo cumplir con la normativa jurisprudencial relativa a la legitimación activa para poder acudir al Tribunal Apelativo.
En primer lugar, el Comité Bo. Portugués no hace men-ción en su escrito de daños que se le causan como asocia-ción, por la aprobación de la DIA-F. En ese aspecto, el Co-mité Bo. Portugués no tiene legitimación activa. En segundo lugar, el Comité Bo. Portugués tampoco indica quiénes son sus miembros. Solo nos informa que se dedica “a actividades educativas y de denuncia del proyecto Ga- *923 soducto”, y acto seguido hace una lista de sus portavoces. Apéndice del certiorari, págs. 28-29. Con ese trasfondo, el Comité Bo. Portugués no nos coloca en posición de ejercer nuestra función revisora y auscultar si alguno de sus miembros tiene legitimación activa, requisito elemental y necesario para que en esta situación el Comité la tenga. A base de todo lo anterior, es ineludible concluir que el Co-mité Bo. Portugués y sus portavoces no demostraron tener legitimación activa en este caso.
De otro lado, el Comité Utuadeño en Contra del Ga-soducto (Comité Utuadeño), se dedica, al igual que el Co-mité Bo. Portugués, “a actividades educativas y de denun-cia del proyecto del Gasoducto”. Apéndice del certiorari, pág. 34. Aduce en su recurso que la construcción y opera-ción del proyecto Vía Verde va a afectar los objetivos de sus miembros, aunque no hace mención específica de ningún tipo de daño. Tampoco relaciona su impugnación con la DIA-F, que es la acción administrativa que impugna aquí. Asimismo, el Comité Utuadeño no nos informa quiénes son sus miembros, lo que nos imposibilita la tarea de adjudicar los méritos de su reclamo. Ante ese escenario, es preciso concluir que el Comité Utuadeño no demostró tener legiti-mación activa en el caso que nos ocupa.
Finalmente, el último recurrido es el Sr. Miguel Báez Soto. Este aduce que tiene legitimación porque transita a diario por un tramo de la ruta propuesta para el proyecto Vía Verde. Es incorrecta su contención. El mero hecho de que el señor Báez Soto transite por un tramo (aunque no especificó cuál) cerca del proyecto Vía Verde no le confiere legitimación activa en este caso. Al igual que los casos an-teriores, no demostró ningún daño concreto, específico, no hipotético, producto de la aprobación de la DIA-F. Su ale-gación es más escueta que la del vecino a quien no le reco-nocimos legitimación activa en Fund. Surfrider y otros v. A.R.Pe., supra. Por consiguiente, el señor Báez Soto tam-poco demostró ostentar legitimación activa.
*924 Como se aprecia, en el caso que nos ocupa no se exponen alegaciones ni reclamos de daños reales, concretos y palpables. Ninguno de los daños aducidos por Juan Cortés Lugo y otros son producto de una controversia real o una situación específica. Por el contrario, los daños alegados se presentan en el abstracto, mediante controversias hipotéticas. No identifican qué daño les causa la aproba-ción de la DIA-F.
En conclusión, como Juan Cortés Lugo y los demás re-currentes no tienen legitimación activa, el foro apelativo intermedio no cuenta con jurisdicción para atender en los méritos la revisión judicial que se le presentó. Debió soste-ner su decisión inicial de desestimar el recurso.
V
A modo de epílogo, conviene contrastar las diferentes opiniones que se emiten en el día de hoy. En ellas, se apre-cian, de forma palmaria, visiones encontradas sobre cuál debe ser el rol de la Rama Judicial al momento de adjudi-car controversias en nuestro sistema constitucional de gobierno. Al fin y al cabo, en el seno de este Tribunal sub-yace un dilema filosófico que por siglos ha cautivado a la humanidad: el rol del juez al momento de resolver controversias. Véase K. Yoshino, On Empathy in Judgment (Measure for Measure), 57 Clev. St. L. Rev. 683 (2009).
Normalmente, cuando alguna persona no simpatiza con la decisión de un tribunal, la cataloga como un ejercicio de activismo o autorrestricción judicial, según sea el caso. K. Kmiec, The Origin and Current Meanings of Judicial Activism, 92 Cal. L. Rev. 1441 (2004). Sin embargo, la tarea de categorizar una decisión judicial como activista o restric-tiva no es siempre sencilla. C. Roberts, In Search of Judicial Activism: Dangers in Quantifying the Qualitative, 74 Tenn. L. Rev. 567 (2007). Véase, además, F. Cross and S. Lindquist, The Scientific Study of Judicial Activism, 91 Minn. L. Rev. 1752 (2006).
*925 Eruditos del tema definen como activismo judicial la si-tuación en que un tribunal adquiere jurisdicción impropia-mente sobre un caso, en violación a los principios de sepa-ración de poderes, debido a que la Constitución le otorga esa autoridad a otra rama de gobierno. Roberts, op. cit., pág. 581. Incluso, algunos describen ese método como una falla de los tribunales en adherirse a los límites jurisdic-cionales en su propio poder o como una relajación inapro-piada de los requisitos de justiciabilidad. Id., citando a W. Marshall, Conservatives and the Seven Sins of Judicial Activism, 73 U. Colo. L. Rev. 1217, 1220 (2002); S. Harwood, Judicial Activism: A Restrained Defense, London, Ed. Austin Winfield, 1996, págs. 19-20.
Por el contrario, los que favorecen la autorrestricción judicial entienden que los tribunales siempre deben hacer un ejercicio analítico para definir los límites de su rol cons-titucional en la adjudicación de controversias. A. Kava-hagh, Judicial Restraint in the Pursuit of Justice, 60 Univ. of Toronto L.J. 23, 26 (2010). Los que se enuncian a favor de la autorrestricción judicial sostienen que el Poder Judicial le debe gran deferencia a las medidas del Poder Legis-lativo y del Poder Ejecutivo, a menos que sean inconstitu-cionales o quebranten alguna ley en específico. Z. Baron, The Many Faces of Judicial Restraint, 21 B.U. Pub. Int. L.J. 61, 62 (2010).
Más allá del debate académico en torno a cuál visión es más sabia, nuestra postura como integrantes de este Tribunal es guardar fidelidad completa a nuestro ordenamiento jurídico. Ello implica que no intervendremos con las decisiones de las otras ramas de gobierno, a menos que la actuación de algunas de estas vaya en contra de la Constitución o alguna ley en específico. Adviértase que a este Foro no le corresponde establecer la política pública que debe regir en las otras ramas de gobierno. El día que hagamos eso, quebrantaremos el principio de separación de *926 poderes, firmemente arraigado en nuestro sistema de derecho. Véase Const. P.R., L.P.R.A., Tomo 1.
En tiempo reciente no hemos vacilado en indicar que a “los jueces no nos puede dominar el temor a decidir”, Domínguez Castro et al. v. E.L.A. I, 178 D.P.R. 1, 15-16 (2010), incluso “aunque lo que decidamos nunca antes se haya resuelto”. Trans-Oceanic Life Ins. v. Oracle Corp., 184 D.P.R. 689, 926 (2012). Ahora, tenemos que añadir que la imparcialidad debe ser la piedra angular que guíe nuestros razonamientos, sin importar quiénes sean las partes ni la empatia que sus planteamientos nos provoquen. Eso implica que si bien nuestras ideas y experiencias influyen en nuestro análisis al momento de adjudicar una controversia, debemos analizar los argumentos de las partes involucradas como lo haría la famosa Dama de la Justicia, con la mayor objetividad que nuestra condición humana nos permita. En esta coyuntura, conviene recordar cómo Juan Carlos Mendonca describe el mandamiento judicial de la imparcialidad:

V. S[É] IMPARCIAL

El litigante lucha por su derecho, en tanto que tú luchas por el derecho; y esto no debes olvidarlo nunca. No te dejes llevar por sus simpatías o antipatías, por conveniencias o compasio-nes, por temor o misericordia. La imparcialidad implica el co-raje de fallar contra el poderoso, pero también el valor, mucho más grande, de fallar contra el débil. J.C. Mendonca, Los Mandamientos del Juez, 7 (Núm. 1) Forum 34 (1991).
VI
Por los fundamentos señalados, se expide el auto de “cer-tiorari” en estos recursos consolidados, se revoca el dicta-men emitido por el Tribunal de Apelaciones y se desestima el caso en su totalidad por falta de jurisdicción.

Se dictará sentencia de conformidad.

*927 La Jueza Asociada Señora Fiol Matta emitió una opi-nión disidente, a la cual se unieron el Juez Presidente Se-ñor Hernández Denton y la Juez Asociada Señora Rodrí-guez Rodríguez. Además, la Juez Asociada Señora Rodríguez Rodríguez disintió con una opinión escrita.

 En específico, el Sr. Iván Vélez González, la Sra. Francisca Montero Colón, la Sra. Sol María de los Ángeles Rodríguez Torres, el Sr. Iván Carlos Vélez Montero, el Sr. Aristides Rodríguez Rivera, la Sra. Ada Rodríguez Rodríguez, el Sr. Alex Noel Natal Santiago, la Sra. Miriam Negrón Pérez, el Sr. Francisco Ruiz Nieves, la Sra. Silvia Jordán Molero, la Sra. Ana Serrano Maldonado, el Sr. Félix Rivera González, el Sr. William Morales Martínez, la Sra. Trinita Alfonso Vda. De Folch, el Sr. Alejandro Saldaña Rivera, la Sra. Dixie Vélez Vélez, la Sra. Dylia Santiago Callazo, el Sr. Ernesto Forestier Torres, la Sra. Miriam Morales González, la Sucesión de Ada Torres compuesta por Carmen Juarbe Pérez, Margarita Forestier Torres y Ernesto *922 Forestier Torres, el Sr. Fernando Vélez Vélez, la Sra. Emma González Rodríguez, el Sr. Samuel Sánchez Santiago, la Sra. Raquel Ortiz González, la Sra. Maritza Rivera Cruz, el Sr. Virginio Heredia Serrano, la Sra. Lillian Serrano Maldonado, el Sr. Yamil Heredia Serrano en representación propia y de su hijo menor Jean Paul Heredia Marrero, el Sr. Pablo Montalvo Bello, la Sra. Ramona Ramos Días, el Sr. Virgilio Cruz Cruz, la Sra. Cándida Cruz Cruz, la Sra. Amparo Cruz Cruz, el Sr. Gilberto Padua Rullán, la Sra. Sabrina Padua Rullán, la Sra. Maribel Torres Carrión, el Sr. Hernán Padín Jiménez, la Sra. Rosa Serrano González, el Sr. Jesús García Oyóla, la Sra. María Cruz Rivera, el Sr. Cristóbal Orama Barreiro, la Sra. Haydee Irizarry Medina, la Sra. Elizabeth Nazario Rodríguez, la Sra. Lydia Muñoz Mercado y la señora Samira Yassin Hernández.